William H. Powell v. Commissioner.
William H. Powell v. Commissioner
Docket No. 4334.
United States Tax Court
1946 Tax Ct. Memo LEXIS 16; 5 T.C.M. (CCH) 1081; T.C.M. (RIA) 46289; December 11, 1946
*16 1. Amounts paid to and received by the former wife of petitioner during the years 1937 and 1938, under the provisions of a contract with a motion picture corporation calling for her services over a five-year period, are not includible in the gross income of the petitioner. 2. Where property settlement and separation agreement executed in 1925 by petitioner and his wife provided for the creation of a trust, all of the income of which was payable to the wife during her lifetime, and, in 1930, petitioner was divorced by decree of California court which was silent as to alimony, petitioner under California law owed no obligation to his wife for her maintenance and support during taxable years 1937 and 1938, and hence so much of trust income as was distributable or distributed to wife during taxable years was not "income" to petitioner and was not taxable to him. 3. Where property settlement and separation agreement executed by petitioner and his wife in 1925 provided for divided custody of minor son by petitioner and wife, payment by petitioner for the clothing, schooling and medical attention of son and $25 per week for a nurse, and further provided that while son was in custody of wife, *17 petitioner should not pay for son's maintenance, nor for his board and lodging while living in custody of wife away from home of wife, and where during taxable years, and for many years prior thereto, petitioner paid directly some of expenses incidental to son's care, support and maintenance, and took care of any expenditures of this nature made by the wife through medium of an allowance or reimbursement, no part of trust income distributable to wife may be included in income of petitioner on the ground that he enjoyed the benefit of such income through the discharge of his legal obligation to support his minor son. 4. Petitioner, in his income tax returns for 1937 and 1938, did not understate or fail to disclose his true gross or net income for the purpose or with the intent of evading the true and correct tax due from him for said years, and these returns were in no respect false or fraudulent. 5. The disallowance by the Commissioner of a dependency credit claimed by petitioner, held barred by the statute of limitations. Kenneth E. Grant, Esq., 1125 Citizens National Bank Bldg., Los Angeles 13, Calif., for the petitioner. Earl C. Crouter, Esq., for the respondent. HARLAN
Memorandum *18 Findings of Fact and Opinion HARLAN, Judge: The respondent determined deficiencies in income tax and penalties against the petitioner for the calendar years 1937 and 1938 as follows: Year
Deficiency
50% Penalty
1937
$95,789.61
$47,894.81
1938
94,070.54
47,035.27
Petitioner asserts that he overpaid his tax for the year 1937 in the amount of $1,228.75, and for the year 1938 in the amount of $354.34. The questions presented are as follows: (1) Whether the petitioner realized unreported income in either or both of the taxable years involved herein, in the amount of $141,000 in 1937, or $174,000 in 1938, or partly in 1937 and partly in 1938, for services rendered the Twentieth-Century Fox Film Corporation in connection with the making of the motion picture, "The Baroness and the Butler." (2) Whether the income from a certain Powell Trust is taxable to the petitioner for 1937 and 1938. (3) Whether the petitioner is entitled to a credit of $366.63 for 1937 for support of Mary L. Tierney, mother of the petitioner's ex-wife. (4) Whether any part of the deficiency for either or both years is due to fraud with intent to evade taxes, so that the 50 percent penalties also are due. Findings of Fact Petitioner, *19 a motion picture actor and resident of Beverly Hills, California, filed his income tax returns for the taxable years in the sixth collection district of California. His books of account were kept and his income tax returns were made on a cash basis. In petitioner's return for 1937 he reported the receipt of income in the amount of $228,000 and in his return for 1938, $58,628.38. Of these amounts $43,333.33 was reported as having been received from Twentieth Century-Fox Studios (Twentieth Century-Fox Film Corporation, hereinafter referred to as Twentieth Century) during the year 1937, and $11,666.67 was reported as having been received from Twentieth Century during the year 1938, or a total of $55,000 for the two taxable years. The 1937 return, filed on March 15, 1938, claimed a credit of $366.63 for eleven months on account of dependence of Mary L. Tierney, ex-mother-in-law, 70 years of age; and both returns claimed a credit of $400 for dependency of the petitioner's son, William David Powell. In such returns petitioner also reported as non-taxable income certain amounts of trust income of a William H. Powell and Jule M. Powell Trust, of which the Bank of Manhattan (successor of American *20 Trust Co.) was trustee, "for sole benefit of ex wife and son" in the amount of $1,773.38 for 1937, and $1,485 for 1938. Jule M. Powell, the deceased former wife of petitioner, will hereinafter be referred to by her stage name of Eileen Wilson. On March 5, 1943, prior to the expiration of the five-year statute of limitations provided by section 275 (c) of the Revenue Act of 1936, petitioner and respondent entered into a written "Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax" (form 872) for the calendar year 1937, extending the period of limitation to June 30, 1944. Said instrument contains the following provision: This agreement is entered into pursuant to Section 276 (b) of the Revenue Act of 1936, but, anything herein to the contrary notwithstanding, this agreement is intended to have and shall have reference solely to assessment of a deficiency in tax, if any, to which Section 275 (c) of said Revenue Act is applicable, and shall not be effective for any other purpose whatsoever. On February 26, 1942, prior to the expiration of the three-year statute of limitations upon assessment and collection of petitioner's 1938 income tax, he and respondent entered *21 into a written "Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax" (form 872), for the calendar year 1938, extending the period of limitation to June 30, 1943; and, thereafter, on April 29, 1943, executed and delivered to each other a like written extension further extending such period of limitation for the year 1938 to June 30, 1944. Respondent's notice of deficiencies for the years 1937 and 1938 was mailed to petitioner on December 30, 1943. The respondent determined and asserted 1937 and 1938 deficiencies and penalties as set forth above (Preliminary Statement), based upon increases of taxable income as follows: 1937
Compensation for services rendered
to Twentieth Century
$141,000.00 *
Trust Income
1,773.38
$142,773.38
1938
Compensation for services rendered
to Twentieth Century
$174,000.00 **
Trust Income
1,485.00
$175,485.00 The 50 percent penalties were asserted under Section 273 (b) of the Revenue Acts of 1936 and 1938. The claim for the dependency credit of $366.63 for Mary L. Tierney made in petitioner's 1937 return was disallowed by the respondent for lack of evidence that *22 she was actually dependent upon petitioner and that he furnished her chief support. On April 15, 1915, petitioner and Eileen Wilson were married. On February 27, 1925, one child, William David Powell, was born of the marriage. Petitioner and Eileen Wilson separated as husband and wife on or about August 4, 1925, and on that date they entered into an agreement at New York, to which the American Trust Company of New York, was also made a party as trustee of the trust provided for by the agreement. The third paragraph of the agreement stated that "This agreement providing for the custody of the child, and the maintenance and support of the wife and the child respectively, shall continue so long as the husband and wife live separate and apart, irrespective of whether they retain their separate status under this agreement or whether they shall hereafter be divorced"; that nothing contained therein should prevent any of its provisions, relative to the maintenance and support of the wife and child from being incorporated in the decree or judgment of the Court, in the event of a decree or judgment of divorce being rendered in favor of the wife by any court; that the agreement should be considered *23 by husband and wife and accepted by the wife in lieu of any rights which she has or may have for support or alimony temporary or permanent, or any claim for such in any action she may bring in the future, either for separation, limited divorce or absolute divorce; and that the wife released her husband, his heirs, personal representatives, and estate, from all rights or claims by way of inheritance or descent which she then had, or might thereafter acquire, including all rights of dower and all rights of every kind growing out of the marital relationship. Other pertinent provisions of the agreement are the following: (1) That petitioner, by installment deposits, should set up a trust fund with the American Trust Company, as trustee, with a minimum principal or corpus of $25,000 and a maximum principal or corpus of $30,000.00, "for the benefit of the wife and the child"; (2) That petitioner should pay to Eileen Wilson for her support and maintenance $100.00 per week commencing August 1, 1925, and continuing until such time as a trust fund of $25,000.00 was established, such weekly payments to continue in any event until one hundred four payments were made; (3) That all income resulting *24 from the trust estate in the hands of the trustee should be paid in quarterly installments to Eileen Wilson until death or remarriage, whichever event should first occur; (4) That after the trust fund amounted to $25,000.00 Eileen Wilson should have the right to draw upon the corpus or principal of the trust if by reason of illness or unemployment her income from all sources during any year, beginning August 1st, including the trust income, should be less than $3,000.00 the amount of corpus or principal subject to withdrawal to be the difference between such income from all sources and the stipulated sum of $3,000.00; (5) That the "rights of the wife and of the child" should not be assignable, and not be subject to anticipation or alienation by voluntary act or in invitum by creditors, of the wife or child, or by operation of law or otherwise; (6) That the trust could at any time be terminated by an instrument in writing executed by both petitioner and Eileen Wilson, or, in like manner, modified, amended or revoked, in whole or in part; (7) That the management, direction and control of the trust was vested solely in the American Trust Company, as trustee; (8) That the trust should *25 terminate on the death or remarriage of Eileen Wilson; (9) That in the event of termination of the trust by reason of the death of Eileen Wilson, one-half of the trust corpus was payable to William David Powell, the son of petitioner and Eileen Wilson; and the remaining one-half to petitioner, subject to his obligation to make provision so that during the lifetime of the mother of Eileen Wilson, the income from $7,500.00 (or any lesser amount received by him on such termination) should be paid to her; (10) That in the event of termination of the trust by reason of remarriage of Eileen Wilson, $10,000.00 of the trust corpus was payable to her and the balance to petitioner, if living, otherwise to the son, William David Powell; (11) That Eileen Wilson should have the right to the sole custody of the son until he reached his sixth birthday, and that thereafter neither parent should have sole and exclusive custody, care and control of the son but each should have equal right to his custody, care and control and for an equal period of each year. (12) That while the son was in the sole custody of Eileen Wilson, petitioner should pay her $25.00 per week for a nurse and should pay, in addition, *26 for the clothing, schooling and medical care of the son, petitioner to be the judge of the amount to be expended by him therefor; (13) That while the son was in the custody of his mother, petitioner should not pay for his maintenance, nor for his board and lodging. On the date the agreement was executed William David Powell, the son, was approximately six months old. In compliance with the provisions of the agreement petitioner deposited with the trustee, in installments the sum of $30,000 for the purposes stated in the provisions of the agreement relating to the trust. This was done by the end of 1928. During the period that the trust corpus was being accumulated in the hands of the trustee, petitioner paid Eileen Wilson the weekly installments of $100 each and also paid her the amounts provided in the agreement for their son. By the end of 1928 petitioner had complied with the provisions of the agreement which required performance on his part. On or about January 24, 1930, an interlocutory judgment of divorce dated January 22, 1930, was entered in the Superior Court of the state of California in and for the county of Los Angeles in the action for divorce filed by Eileen Wilson (referred *27 to therein as Jule M. Powell), as plaintiff, against petitioner as defendant. Said interlocutory judgment of divorce provided, among other things: (a) That the agreement entered into between Eileen Wilson and petitioner under date of August 4, 1925, was ratified, confirmed and approved; (b) That the custody, maintenance and support of William David Powell, the minor son of the parties, as provided for in the said agreement of August 4, 1925, was ratified, confirmed and approved. Said interlocutory judgment of divorce neither awarded Eileen Wilson any alimony, temporary or permanent, nor contained any provision requiring petitioner to support or maintain her, or to provide for her financially in any manner whatsoever. Said interlocutory judgment of divorce contained no provision by which the Superior Court of the state of California in and for the county of Los Angeles retained jurisdiction thereafter to modify the interlocutory decree with respect to alimony or the support and maintenance of Eileen Wilson. On or about January 26, 1931, no appeal having been taken from the aforesaid interlocutory judgment of divorce, a final judgment of divorce was entered in said action. On August *28 8, 1939, the petitioner paid to the collector of internal revenue for the Sixth Collection District of California the sum of $1,134.97, plus interest of $93.78, on account of the deficiency resulting from the trust income for the year 1937. On November 16, 1939 the petitioner paid to the same collector the sum of $341.55, plus interest of $12.79, on account of the deficiency resulting from the trust income for the year 1938. Pursuant to agreement between petitioner, Eileen Wilson and the trustee, the trust was terminated on January 11, 1939, and the trust corpus was turned over to Eileen Wilson. Eileen Wilson was an actress of unusual ability and versatility, and of long experience on the legitimate stage commencing in her early teens and extending over a period of more than twenty years, including numerous successful appearances in leading and outstanding roles on the New York stage and with leading stock and road companies at London, Washington, Boston, Chicago, Cleveland, Oakland, Los Angeles, and other cities throughout the country. At the peak of her stage career, she received compensation of $400 per week. Her theatrical career ended in 1932 or 1933, and prior to 1937, she had *29 never performed in any motion picture and had never had a screen test. Eileen Wilson transferred her residence from New York to Los Angeles in 1928 because of her desire and that of petitioner that their son might have the benefits of association with both parents, and both parents the pleasure of his companionship as far as was possible under the circumstances of their separation as husband and wife. After locating in Los Angeles Eileen Wilson repeatedly sought the assistance of petitioner in securing her employment in her chosen profession within the motion picture industry. She was confident that she had the ability to succeed on the screen as she had on the stage. Her attempts to secure employment as a motion picture actress, however, did not meet with success. Petitioner, although under no legal obligation to do so, during the period January 1, 1929, and ending December 31, 1937, voluntarily furnished her an allowance of approximately $500 per month to provide ample funds "to take care of any requirements of the boy and to take care of her mother" and, "if she chose to do so, such other obligations as she might have." This was in addition to amounts which petitioner paid directly *30 for his son's schooling, doctor, dentist and clothing bills, a cash allowance, camp expenses, etc. During the period ending December 31, 1937, petitioner also from time to time furnished additional funds to Eileen Wilson to assist her in building a home for herself and son and otherwise promoting the son's well being. The petitioner, as early as 1913, had been an actor on the stage, at New York and "on the road." In 1925 he went to California. He made his first motion picture in 1921, and has been making motion pictures almost continually ever since. In the early part of the summer of 1937 the petitioner completed his last picture under a term contract with Metro-Goldwyn-Mayer Studios, under which the petitioner was required to act in ten motion pictures in two years, commencing in 1934, with compensation at the rate of $50,000 per picture. The petitioner performed in nine pictures under this contract. The petitioner had earned more than $200,000 by the summer of 1937, from sources other than Twentieth Century. About the time of the completion of the last picture for Metro-Goldwyn-Mayer Studios, petitioner was advised by his agent, Myron Selznick, of the desire of Twentieth Century *31 to obtain his services for the production of one motion picture tentatively entitled "Jean," but later released and distributed under the title "The Baroness and the Butler." As expiration of his Metro-Goldwyn-Mayer contract approached, petitioner did not contemplate further picture work in 1937 because (a) he was tired and worn out from a strenuous production schedule; (b) he had suffered a severe emotional shock during work on his last picture by reason of the death of the woman he was engaged to marry; (c) he had earned more than $200,000 during 1937 and was cognizant of the fact that the net return to him from further work, especially in view of the high tax rates, would be disproportionate to the value of his services; and (d) he had in contemplation an extended trip to Europe. During the summer of 1937 and before September 3, 1937, when the petitioner left on a trip to Europe, there were various negotiations between Myron Selznick, who was the petitioner's agent, and various representatives of Twentieth Century. Petitioner, on learning of the desire of Twentieth Century for his services, offered through his agent, Myron Selznick, to accept employment in the production of one *32 picture, provided that Eileen Wilson was also employed by Twentieth Century as a motion picture actress; that his services in the contemplated picture should be of short duration; and that he should be paid for his services the sum of $50,000 or at the rate of compensation per picture he had been receiving under his Metro-Goldwyn-Mayer contract which had just expired. Moreover, he caused Twentieth Century to be advised that he would not accept any employment unless Eileen Wilson was also employed as an actress by that company. On September 2, 1937, a document in the form of a letter was addressed to the petitioner by Twentieth Century, which provided in substance that such letter, when accepted by the petitioner, would confirm their mutual understanding and agreement that the petitioner would render services as an actor in portraying the leading male role in connection with the production of the motion picture tentatively entitled "Jean," such employment to commence December 2, 1937, and continue for a period of eight weeks thereafter, to and including January 26, 1938; the petitioner's compensation to be $50,000, payable $10,000 at the end of each of the first five weeks, less 10 *33 percent agent's commissions. This letter also provided that the leading feminine role would be portrayed by one Annabella, who was to be a co-star with Powell. This document was accepted by the petitioner early in December, 1937, and was approved by the legal department of Twentieth Century on December 7, 1937. The petitioner commenced such services under that contract on December 2, 1937. At about the same time of the negotiations between Twentieth Century and the petitioner regarding the above-mentioned agreement, there were negotiations by Myron Selznick, on behalf of the petitioner's former wife, Eileen Wilson, and Twentieth Century, with respect to the negotiation of a contract between Twentieth Century and Eileen Wilson. A draft of such contract was under consideration and discussion on September 3, 1937, at the same time and along with a draft of contract between the petitioner and Twentieth Century. Under date of December 4, 1937, another longer, long-term contract was entered into between Eileen Wilson as the "Artist" and Twentieth Century as the "Producer," which contract also was approved by the legal department of Twentieth Century on December 7, 1937. The two contracts *34 were executed almost simultaneously. The contract between Eileen Wilson and Twentieth Century provided in substance that she would be employed to render services for the producer for a period of five years commencing January 3, 1938, in connection with the production of ten motion pictures to be produced in five years, with no more than two pictures per year; that the producer should give her ninety days notice, in writing, prior to the date her services were to commence in each picture; that she should receive $13,500 per picture in amounts of $519.23 per week for the first two hundred sixty weeks of the term; that payments should continue during any period of incapacity or illness, a like period, however, to be added to the term during which she would be obligated to perform services without compensation; and various other provisions. The contracts of Eileen Wilson and petitioner were executed and delivered by Twentieth Century on or about December 8, 1937. For his services in connection with the filming of "The Baroness and the Butler" petitioner received from Twentieth Century in 1937 the sum of $43,333, and in 1938 the sum of $11,666.67, of which latter amount $5,000 was paid *35 him on account of extra services beyond the contract term. At all times until March of 1939, Eileen Wilson was ready and willing to perform services under the terms of her contract with Twentieth Century. At or about that time she was taken seriously ill following her return from a trip to Mexico, and underwent a series of operations in 1939 and 1940 which ultimately resulted in her death on September 12, 1942. She was not called upon for work in any motion picture prior to her illness, and because of this fact, and her subsequent illness and death, she did not actually perform services as an actress in any motion pictures. In accordance with the provisions of her contract, she was paid at the rate of $519.23 per week to the date of her death. The total annual payments made to her were as follows: 1937
None
1938
$26,999.95
1939
$26,480.73
1940
$27,519.19
1941
$26,999.96
1942
$19,124.97 Twentieth Century paid Myron Selznick & Company, Inc., for its services in securing the contract for Eileen Wilson, the sum of $15,000, or 10 percent of the payments totalling $150,000 provided for in the contract. The $15,000 commission was paid in advance, on January 3, 1938, which was unusual. As a result of *36 her death prior to the expiration of the five-year term of her contract she did not receive the total amount of $135,000 due her thereunder. The balance remaining unpaid at the date of her death amounted to $7,875.20. It was the regular practice of Twentieth Century to set up an operating budget whenever casting a new picture. In 1937 the budget for the picture "The Baroness and the Butler" was charged with the $150,000 to be paid Eileen Wilson under the terms of her contract. The studio treasurer and manager of Twentieth Century decided, after discussing the matter with the legal department and treasurer of the New York office, to charge her salary to the picture that brought her to the studio because she had not been assigned to any definite picture; the prepaid commission on her contract did not make a good asset item; and he felt the conservative accounting procedure was to charge her contract figure, plus the commission, to that picture, and to reverse his accounting procedure when she was assigned to a picture. Following the execution by Eileen Wilson of the contract with Twentieth Century she told petitioner she "didn't have to be a parasite any more" and declined to accept *37 further financial aid or assistance from him. The allowance petitioner had previously given her was terminated. The execution of this contract did not, however, affect the expenditures of petitioner for the maintenance and support of their son, and he continued to make them as he had done theretofore. Petitioner was at no time entitled to receive any of the amounts paid to Eileen Wilson under her contract of December 4, 1937, nor was any part thereof received by him, directly or indirectly, in the calendar years 1937 or 1938, or at any other time. In his petition, the petitioner alleged that the assessment of the deficiency is barred by the limitations provided in Section 275 (a) of the Revenue Act of 1936. Respondent, in his answer to the petition, alleges that the petitioner in his income tax returns for the calendar years 1937 and 1938, wilfully understated the true and correct total gross and net income had, derived, received, and realized by him during said years, for the purpose and with the intent of evading the true and correct tax due for said years. He also alleges that the income tax returns prepared, signed and filed by the petitioner for the said years are false and fraudulent, *38 and were prepared, signed and filed with intent to evade true and correct income tax due from the petitioner. In his income tax returns for the calendar years 1937 and 1938, petitioner did not, willfully or otherwise, understate or fail to disclose his true gross or net income for the purpose or with the intent of evading the true and correct tax due from him for said calendar years. The income tax returns of petitioner for the calendar years 1937 and 1938, and each of them, were in no respect false or fraudulent. Opinion The first issue relates to petitioner's income from personal services rendered to Twentieth Century. Respondent determined that as a result of these services $141,000 should be added to petitioner's income in 1937 and $174,000 in 1938, computed as follows: 1937
1938
Petitioner's contract
$ 50,000.00 *
$ 55,000.00 *
Eileen Wilson's contract
150,000.00 *
150,000.00 *
$200,000.00
$205,000.00
Amount reported by petitioner
43,333.33
11,666.67
$156,666.67
$193,333.33
Less 10% agent's commission
15,666.67
19,333.33
$141,000.00
$174,000.00
Petitioner contends that not *39 only has the income been duplicated, but that the Commissioner erred in charging the income received by Eileen Wilson under her contract, plus the agent's commission, or a total of $150,000 to him in any year whatever. He further contends that he fully and properly reported as compensation received from Twentieth Century the sum of $55,000 - $43,333.33 for 1937 and $11,666.67 for 1938. He urges that the income received by Eileen Wilson was her income, not his; and that she reported her own income and discharged her own tax liabilities. The respondent contends that all of the payments made under the contract between Twentieth Century and Eileen Wilson represented compensation earned by petitioner, and that this income was, in effect, merely assigned to Eileen Wilson, in installments, and chiefly for tax purposes, but that it is all taxable to petitioner. He urges that this case presents but another of those "anticipatory contracts and arrangements" which the courts have uniformly condemned. In support of his contention, the respondent urges that Eileen Wilson rendered no services to Twentieth Century; that the amounts received by her were paid "merely because the petitioner so requested"; *40 that petitioner already had earned $200,000 in 1937 and knew that any additional sum would be "taxed so heavily" that there would be very little net to him; that this was the main reason for the Eileen Wilson contract; that petitioner had the further motive of furnishing money to his ex-wife in a form that would be acceptable to her; that the narrow issue is whether such a "package deal"is to be recognized for income tax purposes; that the full amount of the $135,000 paid to Eileen Wilson was realized by the petitioner; and that even if this court should not find that all of the $135,000 ($150,000 less commission) is taxable in 1937, because all of the petitioner's services had not then been performed, it should be taxed to petitioner in 1937 and 1938 as it was earned, and no later. The petitioner concedes that Eileen Wilson rendered no services under her contract. Her failure to render services does not, however, appear to have been within the contemplation of the parties to her contract at the time it was executed. Fred L. Metzler, studio treasurer and manager of Twentieth Century, called as a witness for the respondent, testified as follows: Q. Did Mr. Goetz or any other officer *41 of the company tell you that Eileen Wilson would definitely not make any pictures over the five-year term? A. No, they didn't say that. Q. What was said, Mr. Metzler? A. They just said at the time the contract was executed there was no definite picture at that time. There could have been plenty of pictures within the five years. Q. Or even within the first year of the term? A. It was within the first few months of the term that this all happened. Another witness for the respondent, William Goetz, the Vice President of Twentieth Century, testified that he intended to use Eileen Wilson just as he used any other stock actress of her type at the studio. The petitioner has proved to our satisfaction that Eileen Wilson, prior to 1932, had had a long, varied and successful experience as an actress on the legitimate stage; that after she arrived in California in 1928 she acquired an ambition to become a motion picture actress and was confident of her ability to succeed as such; and that she urged him on a number of occasions to help her achieve her ambition. As a result of his intervention in her behalf, she secured a contract from Twentieth Century calling for services by her for a period *42 of five years commencing January 3, 1938, in connection with the production of ten motion pictures, no more than two of which were to be produced in any one year. On December 9, 1937, after executing the contract, she wrote petitioner thanking him for his efforts in helping her. Shortly thereafter she was taken to the Twentieth Century studio by a field agent employed by the Myron Selznick agency, and, on the way to the studio, she told the agent she had always worked and was anxious to secure work. At the studio she had an interview with Lew Schreiber, the casting director, who had seen her perform on the New York stage and who told her they were not going to find it hard to place her. Before going to Mexico on a pleasure trip in June of 1938 she called him on the phone and told him she would waive the 90-day notice provision in her contract if they had something for her to do. After returning in August of 1938 she again visited his office and suggested that some photographs be taken of her. An appointment was made but the photographer refused to take the photographs when he discovered that her eye "was all bunged up." Thereafter, and prior to her illness in the early part of 1939, *43 she called "Schreiber up as often as you dare call up a casting director without him getting so sore that he probably wouldn't do anything for you at all" and in January of 1939 she wrote the Selznick office stating that Alice Brady was headed for serious roles and that it might be possible for her to take Alice Brady's place "in the flighty roles." Early in 1939 she became ill and was admitted to a hospital on April 12, 1939. Between that date and December 14, 1940, she underwent four operations. In a deposition taken on September 10, 1941, she testified as follows: Q. Miss Wilson, what is the present state of your health? A. My health is very good, but due to certain things not having healed properly I have to make between eight and nine changes of dressings a day, which means that I am never free or away from taking care of myself for more than two hours at a time. Q. Will this condition go on for some considerable length of time? A. I am hoping it won't be too long, because the dressings about six months ago were 10 and 12 times a day, and they are lessening. Q. Does your doctor advise you as to any particular time when that condition will be over with? A. No, he says it's Father *44 Time and Mother Nature. In 1942, Eileen Wilson took a trip East with her son, and died in a hospital in New York City on September 12, 1942. This evidence convinces us that Eileen Wilson was ready, willing and able to perform services under her contract prior to her illness in the early part of 1939, and that her failure to perform any services under her contract was due to circumstances beyond her control, viz., her inability to get Twentieth Century to assign her to some part prior to her illness in 1939, and her serious illness and subsequent death in 1942. In an effort to prove that petitioner and Twentieth Century fixed the value of petitioner's services at $200,000 and entered into an arrangement whereby Twentieth Century agreed, at the direction of petitioner, to pay $150,000 to Eileen Wilson in installments and $50,000 to petitioner, the respondent called as his witnesses several officials of Twentieth Century. Through witness, Fred L. Metzler, the respondent introduced in evidence Twentieth Century's budget for the picture "The Baroness and The Butler." On page 7 of this budget, headed production budget "Cast," is an entry "William Powell 200,000 Pic." A separate sheet attached *45 to this exhibit, headed production budget "Cast," contains the entry "William Powell 50,000 Pic." Respondent also introduced in evidence an interoffice memorandum of Twentieth Century, dated April 13, 1937, which indicates that Tyrone Power was originally assigned to play the part of "Johann" in the picture at a salary of $600 a week to May 10, 1937, $750 a week thereafter, and a $400 bonus; and an interoffice memorandum dated November 12, 1937, indicating that Twentieth Century substituted petitioner in place of Tyrone Power and that his salary was to be $50,000 for eight weeks, and this change is reflected on page 17 of the budget. In a journal voucher of December 11, 1937, also in evidence, the entry "William Powell 200,000 Pic" in the budget was broken down to show Twentieth Century's total commitment of $150,000 on account of Eileen Wilson and its total commitment of $50,000 on account of petitioner. Witness Metzler testified that it was the regular practice of Twentieth Century to set up an operating budget whenever casting a new picture; that several rough budgets are made until they get down to a total figure somewhere near where they think that the box office will return a *46 profit to the company; that the budget, a bound document, related exclusively to the picture "The Baroness and the Butler"; that it was the budget which was kept and used in connection with the making of that picture; that it is made before the picture starts and is merely a guide to those who work in the picture as to the cost of the various elements that go into the making of the picture; that the sheet attached thereto is a part of the bound budget and is the blotter or work sheet which is changed as budget meetings and story conferences are held; that the interoffice memorandums are notices from the casting office as to the star male part; that in the journal voucher of December 11, 1937, the salaries paid to William Powell and others who had to do with the making of the picture are charged to picture cost on the corporate records of the company; that it contains entries "Undist Sal. Ilene Wilson 150,000. - " and "Undist Sal. Mr. Powell 50,000. - "; that the reason for the first entry was that the Powell contract was accompanied by a contract for Eileen Wilson; that this was a package deal; that the payment of the commission of $15,000 in advance was unusual and it had to be charged *47 off immediately; that since no one could tell him of any definite part Eileen Wilson was going to take in a picture, it was questionable how to handle the subsequent payments to her; that he did not want to set the commission up as a prepaid account because he felt it was not a good asset; that he discussed with the legal department and the treasurer of the New York office the manner of handling the Wilson part of this package deal; that he decided, inasmuch as she had not been assigned a definite picture, to charge all of her contract salary to the picture that brought her to the studio; that it is not unusual to charge a picture with salary representing unassigned time of an actor or actress; that Twentieth Century's unassigned time averages in a year about $1,200,000 and is a big item of cost; that the charging of such amounts to the overhead of a picture is objected to by the producers; that if and when Eileen Wilson started a picture the accounting procedure was to charge as cast cost the $15,000, which was her picture rate, and credit overhead, which would help offset some of the overhead that is created by a lot of other people who have unassigned time; that it was not his intention *48 on the budget, by placing opposite the name of petitioner the figure of $200,000, to indicate that petitioner was to receive that amount for his services in "The Baroness and The Butler"; that this figure represents the combined salaries of petitioner and Eileen Wilson; that he was paid $43,333.33 in 1937 and $11,666.67 in 1938 for his services in that picture; that the budget is nothing more than a blotter or working sheet and there are many things on it that are not in accordance with the actual corporate records; that if Eileen Wilson worked in a picture in 1938 he intended to make the reverse entry above mentioned; and that the only reverse entry made was of the amount she did not collect because of her death prior to the completion of the five-year term of her contract. The fact that Twentieth Century charged the $150,000 to be paid Eileen Wilson to the budget for the picture "The Baroness and the Butler" under the circumstances above narrated, does not in our judgment justify the inclusion of this amount, or any part thereof, in petitioner's income. The budget was kept by Twentieth Century for its own use and convenience, and was not intended to reflect the actual obligations *49 of Twentieth Century to petitioner or Eileen Wilson, or their respective rights under their contracts. Twentieth Century never offered to pay petitioner $200,000 or any sum in excess of $50,000. Moreover, the sum of $200,000 bears no relation to any compensation ever received by petitioner during his entire career. Immediately preceding the execution of the Twentieth Century contract he had received $50,000 per picture from Metro-Goldwyn-Mayer for his services in 10 pictures. The top salary petitioner has ever received on a weekly basis was $12,500 a week, for a four weeks' guarantee, and on one occasion he received $150,000 per picture, which broke down to $7,500 per week because of the time element involved. The cases of ; ; ; , and related cases, cited and relied upon by the respondent, hold "that one vested with the right to receive income did not escape the tax by any kind of anticipatory arrangement, however skillfully devised, by which he procured payment of it to another, since, by the exercise of his power to command the income, he enjoys the benefit *50 of the income on which the tax is paid." . We have searched the record in vain for some indication that petitioner performed the services for which $150,000 was paid to Eileen Wilson, and that she received installment payments totalling this amount (less commission) by reason of some anticipatory arrangement or assignment negotiated by petitioner. Petitioner never was vested with the right to receive the amounts paid to her, and he never received them actually or constructively; neither did he have the right to demand that $150,000 or any other amount, in excess of the $55,000 he received for his services, be paid to her. We see no reason to question petitioner's testimony that he did not fix or suggest what his ex-wife's salary should be, the period of her employment, the number of pictures she should make, or any other terms of her employment. He endeavored only "to get her a job" and he succeeded in accomplishing his purpose by making her employment a condition to his own employment. The amount Twentieth Century agreed to pay him for his services in "The Baroness and the Butler" was substantially the same amount he had been receiving per picture *51 from Metro-Goldwyn-Mayer in the preceding year. The factor which makes the instant proceeding unusual is that Eileen Wilson never performed any services under her contract. If this had been contemplated by the parties at the inception of the transaction, there might be some justification for concluding that she was paid for services performed by petitioner. The uncontradicted evidence is, however, that it was intended that she should render services, and, at least until she became ill early in 1939, she was ready, willing and able to perform. While petitioner was under no legal obligation to support Eileen Wilson at the time she executed her contract, it cannot be gainsaid that he did receive some nonmaterial satisfactions when he assisted her in securing a five-year contract from Twentieth Century. As enumerated by petitioner on brief these were the satisfaction of aiding her in her desire to resume her career as an actress; the assurance that his son's schooling and general environment would not be distrubed by her return to New York to resume a stage career; and the moral satisfaction of eliminating, in some measure, the thought in the mind of his divorced wife that her career as *52 an actress had been sacrificed to the duties of motherhood, while he went on to fame and fortune on the screen. These nonmaterial satisfactions cannot be measured in dollars and cents and have no place in computation of taxable income. Cf. . Our conclusion is that the agreement of Eileen Wilson to perform services as directed by Twentieth Century produced her compensation; that this compensation and her right to receive it were in no way dependent upon the performance or nonperformance of services by petitioner; that he could not and did not assign it to petitioner; and that the respondent erred in including in petitioner's income for 1937 or 1938 any part of the payments made or agreed to be made pursuant to the provisions of the contract between Twentieth Century and Eileen Wilson. Inasmuch as the respondent's allegation of fraud is predicated upon the failure of petitioner to include in his income tax returns for 1937 and 1938 part or all of the amounts paid to Eileen Wilson pursuant to her agreement with Twentieth Century, it follows from our conclusion that these amounts were not includible in his income that the respondent's determination of *53 fraud penalties is reversed. The second issue relates to the respondent's determination that there should be included in petitioner's income for the taxable years the income of the trust created by him in 1925. Respondent contends that this income is taxable to petitioner under the provisions of sections 22(a), 166 and 167 of the Revenue Acts of 1936 and 1938. Although conceding that he was legally obligated to support his minor son during the taxable years, petitioner contends that no part of the trust income, realized during those years, is taxable to him under any of the applicable provisions of the revenue law. Income of a trust, though not received by a grantor, may be taxed to him under the provisions of section 22(a) of the Revenue Acts of 1936 and 1938, if he has reserved the equivalent of full ownership and control of the corpus, , or if it was actually used to pay his debts, for, as was said in , the section authorizes "the laying of the tax against the one who through the discharge of his obligation enjoys the benefit of the income as though he had personally received it." Under the provisions of the property *54 settlement and separation agreement of August 4, 1925, sole control of the trust provided for therein and the investment and handling of the trust corpus and income was vested in the American Trust Company, a disinterested trustee, and petitioner retained no control whatever. , does not, therefore, authorize the taxation of any of the income of the trust to petitioner. The respondent's principal contention is that the trust was for the maintenance and support of petitioner's wife and his minor son; that petitioner was legally obligated to support them; and that the income of the trust was used to satisfy these obligations. The facts of the instant proceeding, with one exception hereinafter noted, are substantially the same as those involved in . In the cited case, the taxpayer, in 1924, created a trust for the benefit of his wife and their three minor children, and in 1926 he was divorced by decree of Connecticut court which was silent as to alimony. The Commissioner contended that during the taxable years 1934 to 1937, inclusive, Ingraham owed an obligation to support his divorced wife and his minor children *55 and that the trust income was his income because used by him through the medium of the trust he created to discharge this obligation. The Circuit Court of Appeals for the Ninth Circuit held that under the Connecticut law a husband is discharged of the duty to support his wife by a final decree of divorce which makes no provision respecting alimony, and consequently he is not to be taxed upon income of a trust used for the wife's support. . The Court, however, recognized the husband's continuing obligation to support and educate the minor children and ruled that the father was taxable upon trust income to the extent it was used to satisfy that liability. The income of the trust in the Ingraham case was payable to the wife during her lifetime, and then to the children who had attained their majority and to the guardian of any minor child. The court said, "it is a proper inference that he [the settlor] relied upon the affection of the wife for the children to cause her use of part of her income from the trust in their care and maintenance. * * * We hold that to the extent the income to the wife was so expended on the children, it was income to Ingraham." *56 In the instant proceeding, the property settlement and separation agreement also provided for the payment of the trust income to petitioner's wife during her lifetime. It provided further that petitioner should pay to his wife $25 per week as an allowance for a nurse while the child is in the custody of his wife, and that he should also pay for the clothing, schooling and medical attention of the child. It also provided that when the child was in the custody of the wife, petitioner should not pay for the maintenance of the child, nor for his board and lodging while he is living in the custody of the mother away from the home of the mother. It might be inferred from the above provision that the intention was that the wife should use part of the income she received from the trust to pay for the child's maintenance, board and lodging while he was in her custody. The evidence indicates, however, that petitioner paid all of the expenses incident to the care, maintenance and support of his son. His testimony, which was corroborated in his wife's deposition, was that subsequent to the divorce and down to the end of 1937, he voluntarily contributed approximately $500 a month to his former *57 wife in order that she might have ample funds to take care of any requirements of their son and to take care of her mother; that these payments continued until Eileen Wilson received her contract from Twentieth Century; and that thereafter he discontinued at her suggestion any payments for the support of herself and her mother, but continued to support and maintain his son, making most payments for this purpose direct and reimbursing his former wife for such expenditures as she incurred in connection with the son's care, maintenance and support. This testimony is uncontradicted, and we think the conclusion is inescapable that the trust income was not used during or prior to the taxable years to discharge all, or part, of petitioner's legal obligation to support and maintain his son. As to the trust income distributable to Eileen Wilson during the taxable years, our conclusion is the same as that reached by the court in , viz., that petitioner cannot be taxed upon such income. In reaching this conclusion the court followed , wherein the Supreme Court of the United States held that the grantor of an alimony trust is not taxable *58 upon income where state law and the trust agreement constitute "pro tanto a full discharge from his duty to support his divorced wife and leave no continuing obligation, contingent or otherwise." The trust income for 1937 and 1938 discharged no liability of petitioner to support his former wife, for he was absolved from all obligation for her support, first by the property settlement and separation agreement itself, and subsequently by the divorce decree of January 22, 1930. Contrary to the respondent's contention the divorce decree placed petitioner under no legal obligation to support Eileen Wilson. The court did not decree, as in , cited and relied upon by the respondent, that the petitioner should create a trust fund. It simply approved "the property agreement made between the parties * * * on the 4th day of August, 1925," which had already been carried into full effect. The decree awarded Eileen Wilson no alimony; it contained no provision requiring petitioner to provide for her financially in any manner; and the divorce court lost all jurisdiction thereafter to modify its decree. The California rule is stated by the Supreme Court of California in , *59 as follows: That the parties may contract with regard to their properties and their respective interests therein is now settled. Though not binding in the first instance on the court in which the divorce action is pending, such contract may be approved and confirmed by the court, and if appropriately referred to and adopted in its decree, as here, such decree, as to the matters covered by the agreement, becomes immune from subsequent modification. * * * Under the provisions of the divorce decree and the property settlement and separation agreement, petitioner received a full discharge of all obligation to support Eileen Wilson prior to the taxable years. It follows from the foregoing that petitioner did not during the taxable years enjoy any benefit from the trust income. It did not satisfy any existing obligation of his to support Eileen Wilson and it was not expended in whole or in part to satisfy his obligation to support, educate and maintain his minor child. This being so, there is no justification for taxing any part of the trust income to him under the provisions of section 22 (a) of the Revenue Acts of 1936 and 1938. No extended discussion of sections 166 and 167 is necessary *60 and little is said about them in respondent's briefs. Section 166 applies to instances where the power to revest in the grantor title to any part of the corpus of trust is vested (1) in the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom, or in any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom. The property settlement agreement provided that the trust might, at any time, be terminated by an instrument in writing executed by petitioner and Eileen Wilson, and that they might at any time, by such an instrument, modify or alter in any manner, or revoke in whole or in part the trust clauses of the instrument, and the trust fund existing. Thus, petitioner at no time was possessed of the power to revest in himself title to any part of the corpus of the trust except in conjunction with Eileen Wilson, who was the holder of a substantial adverse interest in the disposition of the corpus and the income therefrom. Cf. . Section 166 is therefore not applicable. Section *61 167 authorizes the inclusion of the income of a trust in computing the net income of a grantor (1) where any part of the income is or may be held or accumulated for future distribution to the grantor, or (2) may be distributed to the grantor. The trust income was currently distributable to Eileen Wilson until her death or remarriage. Under no circumstances could petitioner share in the income directly or by accumulation for future distribution to him. The income of trust cannot, therefore, be taxed to petitioner under the provisions of section 167. The final issue relates to the disallowance of a dependency credit in the amount of $366.63 for 1937 which petitioner claimed because of contributions made by him for the support of Mary L. Tierney, mother of Eileen Wilson. Petitioner testified that some part of the $500 monthly payments he made to Eileen Wilson was for the support of her mother and that he also gave the mother a separate allowance during 1937, the amount of which was not disclosed. While proof is lacking that Mary L. Tierney received her "chief support" from petitioner during 1937, the contention of petitioner that the disallowance of the claimed credit is barred by the *62 statute of limitations has merit. In his petition, the petitioner alleged that the respondent erred, in the absence of fraud to evade tax or omission from gross income in excess of 25 percent of the gross income stated in his 1937 return, in assessing any deficiency for that year more than three years after March 15, 1938, the date on which the return for 1937 was filed, and that assessment of deficiency for 1937 is barred by the statute of limitations provided by section 275 (a) of the Revenue Act of 1936. This section provides as follows: Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this title shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. * * *
(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after *63 the return was filed. In so far as here pertinent, section 276 provides - (b) Waiver. - Where before the expiration of the time prescribed in section 275 for the assessment of the tax, both the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. The agreement executed by petitioner and respondent extending the period of limitation upon assessment for the calendar year 1937, to June 30, 1944, specifically provided that it was "intended to have and shall have reference solely to assessment of a deficiency in tax, if any, to which Section 275 (c) * * * is applicable, and shall not be effective for any other purpose whatsoever." Section 275 (c), supra, is concerned only with an omission from gross income of an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return. A dependency credit is not an omission from gross income, and the extension of the period of *64 limitation for assessment does not remove the bar of the statute of limitations so as to permit respondent to disallow such a credit. Petitioner's contention that the disallowance of the $366.63 credit claimed by him is barred by the statute is, therefore, sustained. Decision will be entered under Rule 50. Footnotes
*. $156,666.67 less 10% agent's commission. ↩
**. $193,333.33 less 10% agent's commission.↩
*. The respondent concedes that, as a protective measure, he has charged petitioner with the same income in two different years.↩